PHILIP R. SELLINGER
UNITED STATES ATTORNEY
BY:  PETER A. LASERNA
ASSISTANT UNITED STATES ATTORNEY
970 BROAD STREET, SUITE 700
NEWARK, NEW JERSEY 07102
TEL: (973) 645-2739
PETER.LASERNA@USDOJ.GOV

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Hon.** |
| **v.** | : | **Civil Action No. 24-** |
| **$634,778.69 PREVIOUSLY HELD IN J.P. MORGAN CHASE BANK ACCOUNT NUMBER ENDING 3753, HELD IN THE NAME OF SUPREME STATE LLC;** | : :  : | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |
| **$11,807.08 PREVIOUSLY HELD IN J.P. MORGAN CHASE BANK ACCOUNT NUMBER ENDING 0172, HELD IN THE NAME OF SKYER USA INC.; AND** | : :  : | |
| **$7,571.49 PREVIOUSLY HELD IN FIDELITY BANK ACCOUNT NUMBER ENDING 7896, HELD IN THE NAME OF BVP LOGISTICS, INC.,** | : :  : | |
| **Defendants *in rem*.** | : | |

Plaintiff the United States of America, by its attorney, Philip R. Sellinger,

United States Attorney for the District of New Jersey (Assistant United States

Attorney Peter A. Laserna, appearing), for its verified complaint (the "Complaint")

alleges, upon information and belief, as follows:

## I.  <u>NATURE OF THE ACTION</u>

1.     This action is brought by the United States of America seeking the forfeiture of (i) $634,778.69 previously held in J.P. Morgan Chase Bank account number ███3753, held in the name of Supreme State LLC (the "Supreme State Account"); (ii) $11,807.08 previously held in J.P. Morgan Chase Bank account number ███0172, held in the name of Skyer USA Inc. (the "Skyer Account"); and (iii) $7,571.49 previously held in Fidelity Bank account number ██7896, held in the name of BVP Logistics, Inc. (the "BVP Account") (collectively, the "Defendants *in rem*").

2.     The Defendants *in rem* are subject to forfeiture to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C), which subjects to forfeiture any property, real or personal, that constitutes or is derived from proceeds traceable to wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud.

3.     The Defendants *in rem* are additionally subject to forfeiture to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(A), which subjects to forfeiture any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and/or 1957.

## II.  <u>JURISDICTION AND VENUE</u>

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

5.      Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the District of New Jersey.

6.      This Court has *in rem* jurisdiction over the Defendants *in rem* pursuant to 28 U.S.C. § 1355(b)(1)(A).

7.      The Defendants *in rem* are in the custody of the United States Marshals Service.

### III.   FACTS

**A. BACKGROUND**

**i.  Overview of the Conspiracy**

8.      This matter arises from a "romance fraud" scheme involving at least seven separate victims (the "Victims") who lost hundreds of thousands of dollars as a result of the scheme.  The proceeds of the fraud scheme were deposited directly or indirectly into the bank accounts that previously held the Defendants *in rem.*

9.      The investigation revealed that a network of known and unknown individuals (the "Targets") based in the United States and Ghana targeted victims who posted on online dating and social media sites.  Generally, the Targets used fake identities to contact the Victims through these sites.

10.     As explained in detail below, the Targets typically gained the Victims' trust using sympathetic but untrue background stories.  The Targets then fabricated reasons for which they needed money sent to them, and then asked the Victims to send money to them, or to a third-party individual or

company.  The Victims, believing the Targets' stories to be real, sent money to the Targets or deposited money into bank accounts to which the Targets instructed them to send money.  After receiving funds from the Victims, the Targets then moved the victim funds into other bank accounts they controlled.

**ii. Bank Accounts and Companies Used for the Scheme**

11.     On or about December 1, 2014, S.Y. opened the Skyer Account. S.Y. was the sole signatory on the account.  S.Y. resided in the state of Georgia. Skyer USA Inc. ("Skyer") was a company owned by S.Y. and incorporated in Georgia.

12.     On or about April 19, 2019, G.B. opened the Supreme State Account.  G.B. was the sole signatory on the account.  G.B. resided in both New York and Ghana.  Supreme State LLC ("Supreme State") was a company owned by G.B. and incorporated in New York.

13.     On or about May 23, 2019, the BVP Account was opened at Fidelity Bank.  According to Fidelity Bank, the account was opened by an individual with the initials J.L., using a fraudulent driver's license.  J.L. was the sole signatory on the account.  J.L. resided in the state of Georgia.  BVP Logistics Inc. ("BVP") was a company owned by J.L. and incorporated in Georgia.

14.     Global Frieght Management ("Global Frieght") (sic) was a company owned by A.N. and incorporated in the state of Georgia.

15.     Ethen & Altmann Logistics Group ("Ethen & Altmann") was a company owned by E.J. and incorporated in the state of Georgia.

### iii. The Fraud Victims

#### *Victim 1*

16.     Victim 1 was a 65-year-old single female and a resident of Baltimore, Maryland.  On or about June 27, 2019, J.P. Morgan Chase Bank contacted law enforcement and stated that Victim 1 had reported she had been the victim of a fraud subsequent to Victim 1 depositing $23,000 into the Supreme State Account.

17.     On or about June 28, 2019, Victim 1 told law enforcement that she had recently joined a dating website named Plenty of Fish, where she communicated with an individual using the name Corey Clark James ("James").[1]  James claimed he was a member of the U.S. Air Force stationed in Syria.  Victim 1 stated that she began communicating with James on or about March 31, 2019, and had received calls and text messages from him as recently as June 28, 2019.  However, Victim 1 had never met James in person.

18.     During their correspondence, James told Victim 1 that he had a box he was attempting to ship to the United States, but which was held up in Germany at a shipping company named Safelines Agency.  James told Victim 1 that Safelines Agency required a payment of $4,300 in order to release the box.

19.     On or about April 24, 2019, Victim 1 received an email from an individual named Samuel Alan ("Alan") who purported to be a representative of Safelines Agency.  Alan instructed Victim 1 to obtain a $4,300 cashier's check

---

[1] Law enforcement suspects that the names provided to the Victims were fictitious. Therefore, to avoid confusion, the United States is referencing the full names provided by the fraudsters rather than initials.

and deposit it into a TD Bank account held in the name of T.W.  On April 25, 2019, Victim 1 deposited $4,300 into the TD Bank account provided by Alan.

20.    On or about May 1, 2019, Victim 1 received another email from Alan.  Alan claimed that customs officials in France had noticed that the stamp on the box had expired and that the box would be held until a €31,000 (approximately $34,070 U.S.) fee was paid to renew the stamp.  Alan stated that the fee needed to be paid in two days and attached what appeared to be a French customs document.

21.    Law enforcement subsequently determined that the customs document was fraudulent.

22.    On or about May 3, 2019, Victim 1 emailed Alan to advise that she could only pay $18,000 and asked for additional options regarding payment. On the same day, Alan responded to Victim 1 via email and stated: "[y]ou asked me to give you time to come up with the money and now this.  Madam I hope you are not here to play games?  Because I don't seem to understand what's happing right now?  I told your husband $23,000 but you will pay the remaining when you receive your item."

23.    On or about May 5, 2019, Victim 1 emailed Alan and told him that she was expecting a check the following Monday for $23,000 and asked what she needed to do with the $23,000.  On May 8, 2019, Alan emailed Victim 1 and instructed her to obtain a cashier's check for the $23,000 and to deposit it into the Supreme State Account.  On or about May 9, 2019, Victim 1 deposited

a $23,000 cashier's check into the Supreme State Account as instructed by Alan.

24.     On or about May 23, 2019, Victim 1 received another email from Alan.  Alan wrote the following, in part, in the email:

> The box was scanned by the customs in Chicago and we now know there is a huge amount of funds and gold in the so called box.  You and your fiancé have been asked to pay penalty of $300,000, else the box will be seized and you may end up been charged for Money Laundering. . . . The Customs just want to be paid off so they let go of the box to you.  You have caused me a lot.  I have also attached the scanned file to this email.  I tried to prevent them from scanning but the delivery men called saying customs at Chicago insisted on scanning the trunk box or else they will have no option than to seize it.

25.     Alan also stated in the email, "you have 24 hours to pay or it's all over."

26.     Thereafter, Victim 1 became suspicious and called J.P. Morgan Chase Bank to inquire about the account into which she had deposited the $23,000.  According to Victim 1, a J.P. Morgan Chase Bank representative advised her that the account was suspicious and not to deposit any additional funds into the account.

### *Victim 2*

27.     Victim 2 was a 67-year-old single female and a resident of Novato, California.  In or around April 2019, Victim 2 began communicating with a man claiming to be named Ademar Bret ("Bret") on the dating website Match.com. Victim 2 had communicated with Bret via email and telephone but had never met him in person.  Bret told Victim 2 that he was originally from

San Francisco, California, but had recently relocated to the United Kingdom. Bret also told Victim 2 that he works for a satellite dish company.

28.     In or around May 2019, Bret asked Victim 2 to borrow $7,500 to purchase satellite dish parts and promised to pay her back.  Victim 2 agreed to loan him the money for the parts.  On or about May 7, 2019, Bret emailed Victim 2 the name and account number for the Supreme State Account.  Bret instructed her to purchase a cashier's check and then deposit it into the Supreme State Account.

29.     That same day—on or about May 7, 2019—Victim 2 obtained a cashier's check for $7,500 using funds in her own bank account and deposited the check into the Supreme State Account.

30.     On or about May 20, 2019, Bret asked Victim 2 to loan him $18,500 to purchase satellite dish parts and promised to pay her back.  Victim 2 agreed to loan him the money.  That same day, Bret emailed Victim 2 the account name and account number for the Skyer Account.  Bret instructed her to purchase a cashier's check and then deposit it into the Skyer Account.

31.     Thereafter, on or about May 20, 2019, Victim 2 deposited a cashier's check for $18,500 into the Skyer Account.

32.     When interviewed by law enforcement, Victim 2 was initially hesitant to admit that she had been a victim of a fraud, but ultimately acknowledged that she was indeed a victim.

### *Victim 3*

33.     Victim 3 was a 77-year-old single female and a resident of Oregon. On or about June 3, 2019, Victim 3 deposited a cashier's check for approximately $225,000 into the Supreme State Account.  When questioned by law enforcement regarding what the $225,000 deposit was for, Victim 3 stated that she often loaned money to her brother, Alex Platt ("Platt").  Victim 3 stated that Platt runs an import business in Houston, Texas.  Victim 3 stated that she has loaned her brother money in the past and usually takes the money from her retirement or her savings account.

34.     To date, law enforcement has been unable to confirm whether Victim 3 has ever received any money in return for these "loans" to Platt.  In addition, a detailed search of public and law enforcement databases returned no evidence that Victim 3 has any living family members.

35.     With regard to the $225,000 deposit, Victim 3 stated that Platt provided her with the account information for the Supreme State Account and told her to obtain a cashier's check for $225,000 and deposit it into that account.  After Victim 3 deposited the cashier's check for $225,000 into the Supreme State Account, J.P. Morgan Chase Bank froze the account due to suspicious activity.

36.     After J.P. Morgan Chase Bank froze the Supreme State Account, Victim 3 received a call from Platt.  Platt told Victim 3 that he had purchased bakery appliances on behalf of G.B. and that the $225,000 was supposed to go to G.B. through the Supreme State Account.  Platt asked Victim 3 to go to J.P.

Morgan Chase Bank to find out why G.B. could not retrieve money from the account.  When Victim 3 returned to J.P. Morgan Chase Bank, she was advised that the Supreme State Account had been frozen by the bank due to suspicious activity.  Platt told Victim 3 that he had conducted business with Supreme State successfully in the past and that the transactions were related to the purchase of bakery appliances.  Victim 3 stated that she had never had any dealings with either Supreme State or G.B. before.

37.     In addition to the $225,000 that Victim 3 deposited into the Supreme State Account, Victim 3 stated that she had previously deposited approximately $238,000 into an account at Bank of America held in the name of Lameo LLC (the "Lameo Account").  Victim 3 stated that Platt had asked to borrow the money from her for a business transaction and instructed her to obtain a cashier's check and deposit it into the Lameo Account.

38.     On or about July 11, 2019, law enforcement spoke with a representative from Adult Protective Services in Multnomah County, Oregon ("APS"), where Victim 3 resides.  APS advised that they interviewed Victim 3 on or about February 8, 2019, after receiving a referral from Bank of America regarding suspicious financial transactions related to Victim 3 totaling approximately $408,680.

39.     According to APS, from on or about November 29, 2018, through on or about December 5, 2018, Victim 3 deposited two cashier's checks totaling approximately $238,000 into the Lameo Account.  Victim 3 also wired approximately $170,000 into a bank account held in China.  Victim 3 told APS

that the wire transfer was related to family business.  Victim 3 also told APS
that her brother's name was "Thomas Anderson" (not Alex Platt).

40.    APS conducted a search of open-source databases and was able to
identify an address for Lameo Investments in Dumfries, Virginia, and the
Republic of Ghana.

41.    On or about July 12, 2019, Victim 3 contacted law enforcement
and advised that she had spoken to Platt and that Platt reiterated that the
$225,000 she paid into the Supreme State Account was related to legitimate
business.  Victim 3 also stated she did not care whether the $225,000 was
returned to her.

42.    Victim 3 provided law enforcement with the telephone number that
Platt used to communicate with her.  On or about July 16, 2019, law
enforcement called the telephone number for Platt that Victim 3 provided and
spoke to a male who purported to be Platt.  Platt told law enforcement that he
owns an import business in the Netherlands and often travels to China.  Platt
stated that he was currently in China.  Platt stated that Victim 3 is his sister.
According to Platt, he imports appliances from China and the money that
Victim 3 deposited into the Supreme State Account was a loan related to
business that he conducted with G.B.  Platt stated that G.B. purchased bakery
appliances and that he (Platt) was operating as an intermediary.

43.    When asked why Platt would be paying G.B., if G.B. was
purchasing appliances from Platt, Platt did not provide an answer.  Law
enforcement requested any documentation related to the business transaction,

and Platt responded that law enforcement should get it from G.B.  Law enforcement also asked Platt about the money that Victim 3 had deposited into other accounts.  Platt stated that he did not recall other transactions.  Platt also refused to provide an email address for future correspondence.

### *Victim 4*

44.    Victim 4 was a 54-year-old single male and a resident of Eatontown, New Jersey.  Victim 4 deposited a total of approximately $600,000 into various third-party bank accounts—including approximately $50,000 into the Skyer Account—to purportedly pay fees and costs associated with shipping gold from Ghana.

45.    In an interview conducted on or about August 9, 2019, Victim 4 explained that he had met a man named William Oden James ("Oden") on a mobile application called "Surge" approximately one year ago.  According to promotional materials for the application, "Surge is the fastest growing gay dating and social networking app."

46.    Victim 4 told law enforcement that Oden told him that he was a member of the U.S. military who was on a peacekeeping mission in Ghana. Victim 4 stated that early in the relationship he began to mail monthly care packages to Oden in Ghana.  The care packages contained food, clothing, $500 in U.S. currency, $200 in Apple gift cards, and an Apple iPhone, which Victim 4 added to his own wireless calling plan.

47.    Victim 4 stated that he never actually spoke to Oden on the telephone or met him in person.  Instead, they primarily communicated with

each other using Google's instant messaging service, Google Hangouts. When Victim 4 asked Oden to have a conversation over the phone, Oden advised him that talking on the phone was a violation of the military security policy.[2] However, Victim 4 stated that his wireless account records indicated that the iPhone was being used in Ghana.

48.    During their communications, Oden told Victim 4 that his military unit had rescued the son of a local Ghanaian Chief. In return, Oden said that the Chief gave Oden and his commanding officer gold valued at $2.5 million. Oden told Victim 4 that he wanted to pay him back for sending the care packages and wanted to send the gold to Victim 4. Oden told Victim 4 that the gold would be transported and delivered by a diplomat named Wilson Campbell ("Campbell"). Thereafter, Victim 4 began communicating with a male individual purporting to be Campbell via email and text messages.

49.    Campbell told Victim 4 that he was transporting the gold and had been held up at customs in Dubai. Campbell told Victim 4 that Dubai's customs agents required a duty tax in the amount of $16,500. Victim 4 then wired approximately $16,250 to a bank account provided by Campbell. Victim 4 also paid Campbell an additional $2,700, via the payment service PayPal, for living expenses.

50.    After Victim 4 paid the purported customs fee, Campbell told him that the gold was stuck at customs at John F. Kennedy International Airport

---

[2] In actuality, the military regularly allows service members overseas to use cellular telephones at appropriate times and locations.

and that a duty/tax of $370,000 was required before customs would release the gold. Thereafter, in or around September and October 2018, Victim 4 paid approximately $370,000 in increments of approximately $50,000 into various bank accounts provided by Oden, all in the form of cashier's checks.

51.     After Victim 4 paid the $370,000, Campbell told him that he needed to pay an additional $50,000 because the customs service charged storage fees. Campbell instructed Victim 4 to deposit $50,000 into the Skyer Account. Thereafter, from on or about November 2, 2018, through on or about November 9, 2018, Victim 4 deposited approximately five cashier's checks totaling $50,000 into the Skyer Account.

52.     Thereafter, Campbell told Victim 4 that Victim 4 was required to pay sales tax of $170,000 to the State of New Jersey before the gold could be released. Victim 4 told Campbell that he only had $25,000. In response, Campbell told Victim 4 that that he (Campbell) would arrange to have the taxes paid but Victim 4 would need to pay him $25,000 directly.

53.     On or about July 30, 2019, Victim 4 transferred $25,000 into an account purportedly controlled by Campbell's attorney located in Fresno, California. Victim 4 called the attorney's office after he transferred the $25,000 but was told that no one at the office was familiar with Campbell.

54.     Victim 4 told law enforcement that his financial advisor told him he had been the victim of a fraud and to report it to the county prosecutor's office. Victim 4 stated that he visited the prosecutor's office but did not file a

formal complaint because he still believed that Oden was a real soldier, and he did not want him to be falsely accused.

### *Victim 5*

55.     Victim 5 was a 70-year-old single female and a resident of Shoreline, Washington.  In an interview conducted on or about July 29, 2019, Victim 5 reported that, in or around February 2019, she began communicating with an individual named Dr. Anis Tix ("Tix") using the social media site Facebook.  Tix purported to work for the United Nations Medical Team in Afghanistan.

56.     Tix told Victim 5 that the President of Afghanistan gave him a package containing $2.5 million in cash as a gift.  Tix said that he was not able to transport the box himself but could use the services of a "diplomat" based in the United Kingdom named Thomas Falwell ("Falwell").  Tix told Victim 5 that Falwell would travel to Afghanistan to pick up the $2.5 million but required money for travel expenses.  Victim 5 agreed to pay approximately $5,000 for travel expenses for Falwell.

57.     Thereafter, Victim 5 stated that Falwell contacted her via telephone and said that he was in Atlanta, Georgia with the package but could not deliver it because U.S. Customs required a number of "certificates," including a "U.N. Non-Exam Certificate," "Drug Clearance Certificate," and an "Anti-Money Laundering Certificate."

58.     None of these "certificates" actually exist.

59.     Victim 5 reported that she agreed to pay the "certificates" and deposited a total of approximately $66,000 into various bank accounts provided by Falwell.

60.     Among these deposits, Victim 5 sent a wire transfer, on or about April 23, 2019, from her personal bank account into a Wells Fargo account held by Global Frieght Management (the "Global Frieght Account").  Victim 5 never received the package.

61.     According to Victim 5, Falwell later told her to bring approximately $20,000 to an address in Atlanta, Georgia to claim the box.  However, Victim 5 refused to do so.

62.     According to records obtained by law enforcement, Global Frieght's registered address was in Atlanta, Georgia.  A search of open-source databases revealed that this address was a residence, which appeared to be in a new development that was then under construction.  Based on this fact and a review of bank records, it appears that Global Frieght Management was a shell corporation that did not transact in any legitimate business and did not have any legitimate sources of revenue.

### *Victim 6*

63.     Victim 6, a resident of Waterbury, Connecticut, was a 59-year-old widow who had lost her husband approximately one year prior.  On or about July 30, 2019, Victim 6 reported to law enforcement that she was the victim of a romance scam and lost approximately $249,000 as a result of the scam.

64.     According to Victim 6, she met an individual named Mark Miller ("Miller") on the dating website "Our Time."  According to promotional materials for the site, Our Time was "the largest dating network for singles over 50." Miller purported to be a cocoa importer who was originally from Connecticut. Miller told Victim 6 that he was currently in Lima, Peru.  In or around February 2019, Miller told Victim 6 that he was traveling to China.

65.     In between in or around February 2019 and in or around July 2019, Miller told Victim 6 a series of stories—which Victim 6 now believes to be lies—including how he had been kidnapped by the police and shot at the airport.  During that period (*i.e.*, between in or around February and July 2019), Miller repeatedly asked Victim 6 to wire him money.  Also, during that period, Victim 6 estimates that she wired approximately $195,000 into various bank accounts provided by Miller.

66.     According to Victim 6, she wired money to a bank account held by Ethen & Altman on at least four separate occasions as shown below for a total of approximately $121,800:

- February 25, 2019:  $14,900;

- February 28, 2019:  $39,000;

- March 4, 2019:  $59,900; and

- March 12, 2019:  $8,000.

67.     In addition, Victim 6 stated that on two occasions she received packages in the mail that contained checks.  She was instructed to deposit

these checks into a Wells Fargo account.  Victim 6 stated that she later learned that the checks were counterfeit.

68.     The investigation has revealed that Ethan & Altman's registered address was in Atlanta, Georgia.  A review of open-source databases revealed that this address was in an apartment building in Atlanta, Georgia.  Based on this fact and a review of bank records, it appears that Ethan & Altman was a shell corporation that did not transact in any legitimate business and did not have any legitimate sources of revenue.

### *Victim 7*

69.     Victim 7 was a 53-year-old single female and a resident of Fairborn, Ohio.  Records obtained by law enforcement indicated that Victim 7 deposited a check for approximately $14,000 into the BVP Account on or about June 11, 2019.

70.     During a telephonic interview conducted with Victim 7 on or about August 9, 2019, Victim 7 confirmed that she had deposited $14,000 into the BVP Account.  According to Victim 7, she had never heard of BVP Logistics but deposited the money into that account because a "friend" asked her to.  Victim 7 refused to provide any information about the "friend," where they met, the nature of their relationship, or what the $14,000 was for.

71.     Victim 7 stated that the friend originally asked her to deposit $14,000 into an account associated with a company named Risox located in Silver Spring, Maryland.  However, the friend then told her not to use the Risox

account because it had been hacked. Victim 7 stated that she had not heard from her friend since she deposited the $14,000 into the BVP Account.

72.     In addition, the investigation revealed that BVP Logistics' address was in Atlanta, Georgia. A search of open-source databases revealed that a company named Rogers Dedicated Services occupied the address provided for BVP Logistics. A representative from Rogers Dedicated Services confirmed that there was no company named BVP Logistics at their location. Based on this fact and a review of bank records, it appears that BVP Logistics was a shell corporation without any legitimate business or legitimate sources of revenue.

**iv. Law Enforcement Interview With G.B.**

73.     On or about August 1, 2019, law enforcement interviewed G.B., the owner of the Supreme State Account, in New Jersey. G.B. stated that he was from Ghana and owns a successful bakery in Ghana named A1 Bread. On or about April 18, 2019, G.B. traveled to the United States from Ghana to expand his business. G.B. stated that he was working with bakeries in Bloomfield and Newark, New Jersey, in the hopes that he could eventually make and sell A1 bread in New Jersey.

74.     A review of publicly available information appears to indicate that A1 Bread was a bread company based in Ghana, which was owned and operated by G.B.

75.     G.B. claimed that to generate revenue for A1 Bread, G.B. entered into an agreement with three individuals who ran an investment business in

Ghana.  Those individuals were D.D., B.T.A., and A. (LNU) ("A.L.") (together, the "Investors").

76.     G.B. stated that the Investors were supposed to find Ghanaian-Americans in the United States who would invest money in his business.  G.B. stated that for every dollar that the investors put into his bank accounts in the United States, he was required to pay the Investors back in Ghana plus an additional 2.5 % interest.  G.B. admitted that he agreed to this arrangement because it was cumbersome and costly to transfer money from Ghana to the United States and this allowed him to transfer money easily.  G.B. claimed that he had paid the Investors approximately $430,000 as of the August 1, 2019, interview with law enforcement.

77.     G.B. claimed that he never had any direct contact with any of the individuals or companies that deposited money into the Supreme State Account, including Victims 1 through 7, Skyer, BVP, Global Frieght, or Ethen & Altmann.

78.     G.B. stated that once the Supreme State Account was frozen, he contacted J.P. Morgan Chase Bank, which advised him that they had received a complaint on the account.  According to G.B., he contacted D.D. and A.L. and they both told him that the individuals who deposited money into the Supreme State Account (*i.e.*, Victims 1, 2, and 3) were all employees of a company called "SW Boat Ventures" and had willingly deposited money as an investment.  G.B. also stated that he was under the impression that the companies that had deposited money into his account (*i.e.*, BVP Logistics, Ethan & Altman, and

Global Frieght) were also "investors" who were recruited to invest in his business.

79.     Notably, G.B.'s explanation of the financial transactions described herein differs significantly from the explanation for the financial transactions that Platt—who claimed to know G.B.—provided to law enforcement.

80.     Bank records obtained by law enforcement indicated that on or about May 23, 2019, a $300,000 wire transfer was made from the Supreme State Account into a J.P. Morgan Chase account held by Metpak Inc. (respectively, "Metpak" and the "Chase Metpak Account").

81.     Metpak was a packaging business located in Brooklyn, New York owned by I.K.  When asked about this transfer, G.B. stated that money was a loan to help I.K. expand his Metpak business.  G.B. stated that he had purchased plastic bags for his own A1 Bread business from Metpak in the past. G.B. provided two invoices dated March 26, 2019, and June 25, 2019, indicating that he had purchased over 350,000 plastic bags from Metpak.

82.     According to G.B., he did not have a written agreement for the $300,000 loan to I.K. and he had not discussed a payment plan or any terms regarding the loan with I.K.  When asked why he gave I.K. a $300,000 loan, given that G.B. needed to solicit investors for his own bread business in the United States, G.B. said only that I.K. was a friend he wanted to help.

83.     Following the May 23, 2019 wire transfer for $300,000 from the Supreme State Account into the Chase Metpak Account, J.P. Morgan Chase

Bank froze both the Supreme State Account and the Chase Metpak Account due to suspicious activity.

84.     On or about July 29, 2019, law enforcement contacted I.K. and explained that the Supreme State Account (from which the $300,000 was paid into the Chase Metpak Account) had received hundreds of thousands of dollars from victims of a fraud.  I.K. stated that he was a friend of G.B. and that he did not know the $300,000 may have been obtained by fraudulent means.

85.     Upon request by law enforcement, I.K. agreed to return the money he had received from G.B. to the Supreme State Account.

86.     On or about August 15, 2019, I.K. transferred approximately $266,811.42 back to the Supreme State Subject Account.  I.K. stated that he could not return the entire $300,000 because he had already spent some of the money prior to the account being frozen.

**B. THE FORFEITABLE PROPERTY**

87.     The Targets used bank accounts held in the names of various businesses to conduct the romance fraud scheme and to launder the proceeds of the romance fraud scheme.  Such businesses included: Supreme State, BVP, Skyer, Global Freight Management, and Ethen and Altman.

88.     The following table is a summary of victim payments to the Targets:

| Victim | Date/Date Range of Payments | Amount of Payment | Recipient of Payment |
|--------|------------------------------|-------------------|----------------------|
| Victim 1 | May 28, 2019 | $23,000 | Supreme State |
| Victim 2 | May 7, 2019 | $7,500 | Supreme State |
| Victim 2 | May 20, 2019 | $18,500 | Skyer |

| Victim 3 | June 3, 2019 | $225,000 | Supreme State |
| Victim 4 | November 2-November 9, 2018 | $50,000 | Skyer |
| Victim 5 | April 23, 2019 | $10,000 | Global Frieght |
| Victim 6 | February 25 to March 12, 2019 | $121,800 | Ethen and Altman |
| Victim 7 | June 11, 2019 | $14,000 | BVP |

89.    A review of bank records for accounts held by Supreme State, BVP, and Skyer, reveals that victims of the romance fraud scheme transferred the proceeds of the romance fraud scheme into accounts controlled by one or more of these companies.

90.    As stated previously, it appears that Ethan & Altman, Global Frieght, and BVP Logistics are shell companies that do not conduct legitimate business or generate legitimate revenue.  Their accounts were instead being used by the Targets as funnel accounts.

91.    A review of bank information obtained from various banks has revealed that the Supreme State Account received direct deposits from some of the Victims, as well as deposits from multiple shell companies such as Ethan & Altman, Global Frieght, and BVP Logistics.

92.    Specifically, records for the Supreme State Subject Account reveal that on or about May 6th, 8th, 10th, 21st, and 23rd of 2019, the Supreme State Account received five check deposits totaling $160,390 from a bank account held by Ethen and Altman.

93.    Records also reveal that on or about May 7, 2019, the Supreme State Account received a check deposit for $40,000 from a bank account held by Global Frieght Management.

94.     In addition, on or about May 6th, 9th, and 22nd of 2019, the Supreme State Account received four different check deposits totaling $44,750 from two different bank accounts held by BVP Logistics.

95.     After the bank accounts held by Ethan & Altman, Global Freight, and BVP Logistics received payments from victims, the funds in the accounts held by those companies were transferred to the Supreme State Account, which was used by the Targets to receive the proceeds of the romance fraud scheme.

96.     The following table is a summary of deposits into the Supreme State Account from victims and suspected shell corporations:

| Date(s) | Source | Total Deposits |
|---|---|---|
| 5/8/2019 | Victim 1 | $23,000 |
| 5/7/2019 | Victim 2 | $7,500 |
| 6/3/2019 | Victim 3 | $225,000 |
| 5/6/2019 to 5/23/2019 | Ethen & Altmann | $160,390 |
| 5/7/2019 | Global Freight Management | $40,000 |
| 5/6/2019 to 5/22/2019 | BVP Logistics Inc. | $44,750 |
| | **TOTAL** | **$500,640** |

97.     On or about October 3, 2019, $634,778.69 was seized from the Supreme State Account, $11,807.08 was seized from the Skyer Account, and $7,571.49 was seized from the BVP Account, pursuant to seizure warrants issued in the District of New Jersey on October 2, 2019 by United Magistrate Judge Leda Dunn Wetter.

## IV.  <u>FIRST CLAIM FOR FORFEITURE</u>

98.   The allegations contained in paragraphs 1 through 97 of this Complaint are incorporated herein and made part hereof.

99.   The Defendants *in rem*, and all property traceable thereto, are subject to forfeiture as property constituting, or derived from, proceeds traceable to, wire fraud, in violation of 18 U.S.C. § 1343, or a conspiracy to commit such an offense.

100.  As a result of the foregoing, the Defendants *in rem* and all property traceable thereto is subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C).

## V.  <u>SECOND CLAIM FOR FORFEITURE</u>

101.  The allegations contained in paragraphs 1 through 97 of this Complaint are incorporated herein and made part hereof.

102.  The Defendants *in rem*, and all property traceable thereto, property involved in a transactions or attempted transactions in violation of 18 U.S.C. §§ 1956 and/or 1957.

103.  As a result of the foregoing, the Defendants *in rem* are subject to condemnation and to forfeiture to the United States, in accordance with 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America requests that the Clerk of the Court issue a warrant for the arrest and seizure of the Defendants *in rem* pursuant to Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure,

which the plaintiff will execute upon the Defendants *in rem* pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c); that notice of this action be given to all persons who reasonably appear to be potential claimants to the Defendants *in rem*; that the Defendants *in rem* be forfeited and condemned to the United States of America; that the plaintiff be awarded its costs and disbursements in this action; and that the Court grant such other and further relief it deems just and proper.

Dated:  Newark, New Jersey
        June 26, 2024

                                        PHILIP R. SELLINGER
                                        United States Attorney


                                        */s/ Peter A. Laserna*
                              By:   PETER A. LASERNA
                                        Assistant United States Attorney

**<u>VERIFICATION</u>**

I, Darryl Williams, Jr., hereby verify and declare under penalty of perjury that I am a Postal Inspector with the U.S. Postal Inspection Service, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my own knowledge, information, and belief.

The sources of my knowledge and the grounds of my belief include the official files and records of the United States; information obtained directly by me; and information supplied to me from and by other law enforcement officials, during the investigation.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

Dated this __25_ day of June, 2024.


_____*/s/ Darryl Williams Jr.*__
Darryl Williams, Jr., Postal Inspector
U.S. Postal Inspection Service